**Carlton H. WINTERMUTE, Plaintiff,**

v.

**HERMETIC SEAL CORP., Defendant.**

**Civ. A. No. 606–56.**

United States District Court
D. New Jersey.
March 23, 1959.

---

2. Restatement, Torts, § 766(b), 99 A.L.R. 12.

3. Todd v. Skelly, Pa.1954, 70 Montg.Co. Law Rep. 280.

William A. Consodine, Newark, N. J., for plaintiff. Delavan Smith, M. Arthur Auslander, and Hilda Polak, New York City, of counsel.

Ravin & Ravin, by Morris M. Ravin, Newark, N. J., for defendant. Philip G. Hilbert, Washington, D. C., of counsel.

WORTENDYKE, District Judge.

This action is brought pursuant to 35 U.S.C. § 281, by the holder of United States Patent No. 2,454,244, for injunction, damages, and attorneys' fees, in accordance with §§ 283, 284 and 285 of that Title, because of defendant's alleged infringement of the patent.

The patentee's application was filed February 19, 1945, and the patent issued November 16, 1948. It covers a device described therein as "Moistureproof Housing for Piezo-electric Elements."

The action was commenced on July 30, 1956 against Hermetic Seal Manufacturing Co. and Hermetic Seal Products Co., both corporations of New Jersey. On August 8, 1956 these defendants filed a Chapter XI proceeding under the Bankruptcy Act, 11 U.S.C. § 701 et seq. and upon appointment of a receiver,

this action was held in abeyance, but was later reactivated and came to issue by the filing of an answer on December 13, 1956. Following confirmation of a plan of arrangement for the original defendant corporations, all of their assets were transferred to Hermetic Seal Corporation, which was substituted as sole defendant in this action by a stipulation dated March 10, 1958.

The defendant denies the validity of the patent in suit; charges prior disclosure of the claimed invention in several earlier patents; contends that plaintiff's device lacks invention, novelty and patentability; alleges that the claims of the patent relied upon are misdescriptive and vague; and further pleads file wrapper estoppel and laches. Defendant also seeks, by way of a counterclaim, a declaratory judgment that the patent in suit is invalid and not infringed.

In addition to the prior art patents enumerated in the answer, defendant cited four additional patents in its notice of prior art filed October 1, 1958.

The device disclosed by the patent in suit is described in the specifications as "a housing for the piezo-electric element which is capable of withstanding exposure to high humidity for an indefinite length of time" and as "a mounting for the piezo-electric plate, the mounting being particularly suitable for its use in connection with the disclosed housing." The objects of the invention stated in the specifications are "[t]o provide a moisture-proof housing for the piezo-electric elements" and "[t]o provide a piezo-electric unit including a hermetically-sealed housing filled with an inert gas, and a mounting for the piezo-electric plate fitting into the housing." Although the patent contains fourteen claims (35 U.S.C. § 112), only claims numbered 6 and 14 are relied upon in this action.[1]

The evidence and the law upon the issues of validity and infringement of the patent in suit have been briefed by the respective parties and are now before the Court for determination. The general rules of law applicable to a case of this kind are now codified in Title 35 of the United States Code. R. M. Palmer Co. v. Luden's, Inc., 3 Cir., 1956, 236 F.2d 496.

The patent in suit is presumed valid, and the burden of establishing its invalidity rests upon the defendant. 35 U.S.C. § 282; R. M. Palmer Co. v. Luden's, Inc., supra; Hartford National Bank & Trust Co. v. E. F. Drew & Co., 3 Cir., 1956, 237 F.2d 594. In order to be patentable, a device must be a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The device described in the claims of the patent here in suit would not be

---

1. The language of the claims relied upon is as follows:

"6. A moisture-proof housing for a piezo-electric element comprising a metallic cap and a base, said base including a stamped, metallic frame, said frame forming the external member of said base, the upper portion of said frame having two bottom openings, two pins for establishing electrical connections of said element, a glass seal filling the bottom portion of said frame, and holding said pins in concentric relationship with respect to said openings, the inner ends of said pins protruding through said glass seal into said housing for establishing said electrical connections with the mountings of said piezo-electric element, said frame, pins, and glass seal having substantially equal thermal coefficients of expansion, and a solder seal between said cap and said frame for making said housing moisture-proof."

"14. A moisture-proof housing for a piezo-electric-element comprising a cap and a base, said base including external means for receiving said cap, said base having at least one opening therein, and at least one terminal member for establishing an electrical connection of said element, an insulation seal filling said opening and holding said terminal member within said opening, one end of said terminal member protruding through said insulation seal into said housing for establishing electrical connection with a mounting of said element, said base, terminal member, and insulation seal having substantially the same thermal coefficient of expansion, and sealing means between said cap and said base for making said housing moisture-proof."

patentable if it (1) was known or used by others or patented or described in a printed publication before the invention thereof by the applicant; or (2) was patented or described in a printed publication more than one year prior to the date of the application; or (3) was described in a patent granted on an application filed before the claimed invention; or (4) was invented by another prior to its invention by the applicant. 35 U.S.C. § 102. The same statutory section further provides that "[i]n determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other." Even if a claimed invention does not fall within any of the excluded categories set forth in § 102, it may still be unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. See Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846, certiorari denied 1953, 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 345.

Although the patent in suit relates to and teaches a method of housing for facilitating the performance of a piezo-electric element, the use and characteristics of quartz crystals in the field of radio communications, for the assurance of uniformity in the frequencies of radio carrier waves, were well known prior to plaintiff's conception of his device. " 'Piezo-Electric' * * * is a quality possessed by certain crystalline substances such as quartz. A piezo-electrical crystal when compressed develops an electric charge on certain of its surfaces, and conversely, when charged by an electric current, the crystal is compressed and expanded. * * * Each radio transmitting station is assigned a definite transmitting frequency. To avoid interference, it is essential to maintain that frequency constant. * * * To enable the receiver to select between transmitting stations, it is essential that the stations transmit at different frequencies or rather at the particular frequency assigned to them. * * * While the vacuum tube transmitter materially improved the stability of frequency as compared with the early forms of transmitting apparatus, the increasing use of wireless and the multiplication of transmitting stations required stability of frequency in order that sending stations would not interfere with each other. This demand for stable oscillations finally led to the adoption of piezo-electric crystals to control the frequency of the oscillations of the vacuum tube transmitter." Nields, D. J., in Miller v. National Broadcasting Co., Inc., D.C.Del. 1934, 6 F.Supp. 47, affirmed 3 Cir., 1934, 79 F.2d 657. Judge Nields further informs us in the Miller case, supra, that Professor Cady of Wesleyan University began experiments with piezo-electric crystals as early as 1917, and in 1922 published a paper entitled "The Piezo-Electric Resonator." In this paper he disclosed to the art that a crystal was suitable to control the frequency of a vacuum tube oscillator. In 1923 a patent was issued to him for two crystal controlled oscillators in which the frequency of oscillation was controlled by the natural frequency of the crystal. Indeed, the specifications of the patent here in suit expressly recognize the pre-existence of general public knowledge of piezo-electricity and the employment of the electrical characteristics of quartz crystals for carrier wave frequency stabilization. We also learn from these specifications that "[t]he requirements imposed upon the piezo-electric elements, from the point of view of their frequency stability and constancy of their activity, have been increasing at a very rapid rate, and they (have) now reached such a level that even the presence of an insignificant amount of humidity in the housings surrounding and supporting the crystal (has been)

found to be detrimental to the maintenance of constant frequency and activity by the piezo-electric elements." Wintermute further informs us that, despite the evolution of a process by V. E. Bottom for eliminating the aging phenomenon of quartz crystals, their vulnerability to one of the effects of water vapor still remained. "If the moisture present in the air surrounding the piezo-electric plate is allowed to condense on the surfaces of the plate, it acts as a damping means, decreasing the activity of the plate and broadening its frequency response, thus destroying in large measure its usefulness as a frequency control element." Plaintiff's claimed invention, therefore, is merely "a moisture-proof, hermetically-sealed housing" for a piezo-electric element and its mountings.

Wintermute claims that his invention is an improvement over piezo-electric crystal housings previously known to the art because of its capacity "of withstanding exposure to high humidity for an indefinite length of time" by preventing intrusion of water vapor from the atmosphere into the chamber in which the crystal is housed. In essence, therefore, plaintiff's device is an hermetically-sealed housing for an electrical element which will prevent the intrusion of the atmosphere into its interior, but still permit a current flow through the housed device without short-circuiting through the metal of the housing components. In the language of his expert witness, Adams, plaintiff's device is "an assembly of a quartz piezo-electric element that is housed in a metal container that has its electrical contacts carried through this metal container by means of glass insulation, or insulating materials similar to that."

The practice of housing a piezo-electric device in a container to shield it from the effects of varying environmental conditions was also well known to the prior art. Some of such housings were composed of ceramics, others of bakelite or plastics, and others of combinations of such materials. Containers of these types, however, were found to be permeable by moisture from the external atmosphere and consequently the housed units became inefficient when used under conditions of high external humidity. (Such was the experience of the armed forces in the use of the crystal unit FT–243, the housing of which consisted of a phenolic body composed of bakelite with a wood-flour filler, between 1942 and 1944.)

Roger Sykes, an electrical engineer, associated with Bell Telephone Laboratories since 1928, who commenced his association in research in the field and development of piezo-electric devices, testified that the first crystal units for controlling radio transmission were used between 1924 and 1930 and the early housings for these units were direct copies of the glass vacuum tube structure which had previously been used for amplifiers and vacuum tubes. The vacuum tube art is analogous to the art of piezo-electric crystal housings. B. & M. Corp. v. Koolvent Aluminum Awning Corp., 7 Cir., 1958, 257 F.2d 264. In these housings the leads to the piezo-electric element passed through the steel header and were sealed in the stem of the glass housing. They were referred to as Dumet leads, which involved a matching between the glass and the leads. Later plastic was used for the housing envelopes but the attempt to hermetically seal that type of holder was not always successful. In 1940 the effect upon the crystal of moisture intrusion into the housing was recognized as an impairing factor and efforts to exclude such penetration were stimulated. Glass holders and those of ceramic and plastic materials were tried, but the risk of breakage of the glass seals employed turned the investigators to the employment of metal as the housing material. The only difference between the Bell Laboratories' holder and the metal vacuum tube which had previously been used was the slide-fit of the cover and the soldered connection between it and the base. The only difference between that design and the design of Wintermute is found in the fact that the Bell Laboratories' cover slid over the

outside of the base and the cover of Wintermute slid inside of the base. A holder containing a crystal element mounted on leads and having a metal cover was made by Sykes on January 25, 1939. In 1940 General Electric Company manufactured a holder for a crystal mounting including a metal header, glass seals and leads, as employed in the metal vacuum tube. A prototype of the crystal holder housing covered by the Ziegler patent No. 2,503,429, which was assigned to the Bell Telephone Laboratories, was ready for testing as early as 1943.

Hermetically sealed enclosures of electrical elements for the purpose of excluding atmospheric contaminants were early exemplified in the incandescent electric light bulb and radio vacuum tube. The susceptibility of fusion of a piezo-electric crystal when exposed to high heat presents a grave risk of destruction of the crystal's piezo-electric capacity. It is, therefore, essential to avoid exposure of a crystal housing to high temperatures in the process of fusing the materials employed in sealing the current lead-ins and housing components after the crystal has been enclosed. Plaintiff's method of constructing the housing as described in his patent involves the following succession of steps:

(1) stamping of a metal base with one or two openings in the bottom thereof;

(2) sealing a metal lead for the accommodation of an electrode concentrically in each opening in the base by fusion sealing of glass between base and lead;

(3) mounting the crystal holder upon the base;

(4) inserting the metal cover over crystal holder and base; and

(5) sealing metal cover to base with solder.

In the vacuum tube construction art, the sealing of the glass envelope to the metal base or header could be accomplished only after the electrical element had been enclosed, and by the application of a degree of heat in fusing the glass to the metal which would involve a risk of impairing or destroying the usefulness of a piezo-electric crystal. The moderate degree of heat required to solder the cover to the base in plaintiff's device exposed the enclosed crystal to no such risk of fusion. Plaintiff claims novelty in his use of Kovar metal for his base and leads, and borosilicate glass for sealing the leads and insulating them from the base. We learn that the equivalence of the coefficients of expansion of this metal and this glass tends to prevent any thermal shock which might break the seal and thus impair the insulation of the leads from the base and allow the intrusion of the atmosphere into the housing interior.

Plaintiff's file wrapper reveals that the Examiner initially rejected claims 6, 7, 8, 9 and 10 of his application "as substantially fully met" by the Kuenstler Patent No. 2,384,757 issued September 11, 1945 and the Hitchcock Patent No. 1,790,148 issued January 27, 1936; both of which prior patents were cited as references in the Patent Office proceeding. Plaintiff's claim number 6 was initially set forth in his application in language substantially the same as that quoted in footnote 1, supra. The Examiner's rejection of this claim was based upon his interpretation of Kuenstler as disclosing a crystal holder including a glass base with a metal frame and a metal cap soldered to the latter. Claims 7, 8, 9 and 10, also initially rejected by the Examiner, related to the introduction and confinement of different gases within the housing after the soldering of the cap to the base. We are not here concerned with those four claims. On August 22, 1946 an amendment to plaintiff's patent application was filed in the Patent Office, adding three additional claims, numbered 12, 13 and 14. The language of claim 14 is substantially the same as that set forth in the similarly numbered claim of the patent in suit, quoted in footnote 1, supra. In the same communication which embodied the amendment to his application, plaintiff requested reconsideration and allowance of claims 6 to 10 respectively, adding that

"Although it is not thought that the patent of Kuenstler anticipates claims 6 to 10, against which it is cited, the affidavit under Rule 75[2], filed herewith proves that applicant conceived and reduced to practice the claimed subject matter prior to November 15, 1944, and hence prior to the filing date of said patent. Accordingly the patent should be withdrawn as a reference and the claims allowed."

Kuenstler No. 2,384,757 was issued September 11, 1945 upon an application filed November 15, 1944. If plaintiff conceived his device and reduced it to practice prior to the disclosure of Kuenstler in his said application, plaintiff's device would be patentable over that of Kuenstler; provided plaintiff's device constituted invention. In his affidavit under Rule 75, sworn to August 15, 1946, plaintiff deposes that prior to November 15, 1944 he made a record of his invention in the form of a drawing, a copy of which he annexed to the affidavit as Exhibit A. He further deposed in the same affidavit that prior to November 15, 1944 he constructed, tested and derived satisfactory results from the device illustrated in the exhibit, which discloses a crystal holder comprised of a base including a metallic frame, labeled in the drawing as "Kovar Header", and an insulation contained within the frame supporting connecting pins and a metal cap labeled as "Brass Cover", this cap making a sliding fit with the frame and sealed thereto with solder, and opening in the top of the cap being closed by a solder seal. What purported to be a substantial copy of Exhibit A annexed to the affidavit, dated March 25, 1944 was approved for the purposes of a development contract by the Engineer and Development Section of the United States Army Signal Corps, on April 5, 1944.

On May 7, 1947 the Examiner rejected claims 12 through 14, added by plaintiff's amendment of August 22, 1946, because of anticipation by United States Patent No. 2,329,498 issued to Washburn on September 14, 1943. That patent relates to the art of mounting piezo-electric crystals. It does not relate to their housing. As a result of subsequent Patent Office proceedings, the Examiner rejected claims 6 and 11, and 12 through 14 of the application, as misdescriptive, and adhered to his previous rejection of claims 7 through 10 inclusive. The misdescriptions having been corrected, claims 6 and 14, here relied upon (footnote 1 supra), were ultimately allowed by the Patent Office. (The correction of the misdescriptions involved merely the elimination of the word "cap" in one place in each claim, from the recital of elements claimed to have the same thermal coefficient of expansion.)

■ Former Lt. John J. McGuire, Research and Development Officer of the Ground Signal Agency of the United States Army Signal Corps, testified that his Laboratory initiated a project for the development of an hermetically sealed crystal holder of metal, because of the

2. Rule 75 of the United States Patent Office, as of the date of plaintiff's application, now rule 132, 35 U.S.C.A.Appendix, read as follows:

"75. When an original or reissue application is rejected on reference to an expired or unexpired domestic patent which substantially shows or describes but does not claim the rejected invention, or on reference to a foreign patent or to a printed publication, and the applicant shall make oath to facts showing a completion of the invention in this country before the filing of the application on which the domestic patent issued, or before the date of the foreign patent, or before the date of the printed publication, and shall also make oath that he does not know and does not believe that the invention has been in public use or on sale in this country, or patented or described in a printed publication in this or any foreign country for more than two years prior to his application, and that he has never abandoned the invention, then the patent or publication cited shall not bar the grant of a patent to the applicant, unless the date of such patent or printed publication be more than two years prior to the date on which application was filed in this country."

inadequacies of the FT–243 phenolic holder then in use. Designs were submitted by various manufacturers, including the plaintiff (under the name of Radio Development Company), and the design of the latter was selected for development. A motion picture film disclosing the process of assembling plaintiff's device, made at plaintiff's plant in the presence of Lt. McGuire in June of 1944, was exhibited to the Court during the trial. A handmade sample of the device portrayed in the design suggested by the plaintiff to the Signal Corps for purposes of the development contract was submitted late in 1943 or early in 1944, and plaintiff's first production run took place in April or May of the latter year. The moving picture film above mentioned was shown in July, 1944, in Chicago, to a group of some 500 other manufacturers of crystal holders and crystal devices. I am persuaded by the evidence presented to me that plaintiff conceived and reduced his device to practice several months prior to the filing of the Kuenstler application upon which issued the latter's patent No. 2,384,757. I must, therefore, conclude that plaintiff's patent is not anticipated by that of Kuenstler last referred to. Having reached this conclusion, I must likewise conclude that plaintiff's conception and reduction to practice also antedated Kuenstler patent No. 2,404,445 issued July 23, 1946 on application filed August 2, 1944.

In addition to the two Kuenstler and the Washburn patents hereinbefore discussed, defendant relies, to support its charge of invalidity against the patent in suit, upon the following prior art patents: Hitchcock, No. 1,790,148, issued January 27, 1931; Tillyer, No. 1,924,297, issued August 29, 1933; Bieling, No. 2,155,035, issued April 18, 1939; Espe, No. 2,178,747, issued November 7, 1939; Bowie, No. 2,178,826, issued November 7, 1939; Thorson, No. 2,220,742, issued November 5, 1940; and Beggs, No. 2,229,436, issued January 21, 1941. Only Hitchcock, Tillyer, Bieling, Washburn and Kuenstler 2,384,757 are cited as file references in the Wintermute patent.

Hitchcock's application, filed March 27, 1927, informs us that previous workers in the art of utilizing piezo-electric crystals to control the frequency of oscillation generators had found that, when the plate potential of the thermionic device is made sufficiently high to give a substantial power output, sparking will take place across the crystal between the supporting electrodes causing ozone formation, which attacks the metallic portions of the crystal holder, and generation of sufficient heat to crack the crystal. To eliminate this sparking tendency, Hitchcock electro-plates the crystal with metal, employs a non-oxidizing material for the electrodes and associated metallic elements, and supports the assembly of crystal and electrodes in a rarefied, inert gas. Wintermute encloses a piezo-electric unit in an hermetically sealed housing filled with an inert gas. Each device, therefore, is a piezo-electric crystal housing necessarily hermetically sealed to retain the gas in its interior. Hitchcock's housing is a glass container provided with an electrode-supporting press through which extend lead-in wires connected to appropriate external contact elements. He does not explain, however, (a) of what the base of his container is composed, nor (b) how he seals the base to the container. Presumably his "electrode-supporting press" serves to insulate his lead-in wires from each other. Thus Wintermute's device differs from that of Hitchcock in the following respects: (a) use of metal instead of glass for the envelope; (b) insulation of external contact elements (and connected electrodes) from base by glass seals; (c) composition of base and seals of materials having equivalent thermal coefficients of expansion; (d) employment of solder for sealing cap to base.

In 1933 Tillyer claimed "5. A piezo electric crystal apparatus comprising an air-tight container having located therein a crystal element mounted between two spaced electrodes * * *, means for regulating the air pressure within said container, and a plurality of conductors

associated with said crystal at least one of which passes through said container, said one conductor having its entrance point to the container suitably sealed for preventing the atmosphere from affecting the pressure within said container, or vice versa." Tillyer's principal objective was to overcome the effect of varying temperatures upon the residue of air in a partially evacuated crystal container which changed the crystal's frequency of oscillation. He achieved this objective by positioning the crystal between metallic plates, enclosing the assembly in a housing formed by cementing a glass container upon a glass base and providing means for exhausting the air from the interior of the enclosure. He drew his current wires through the base and container separately, sealing the necessary hole in each member to make the interior air-tight "by the use of the usual sealing wire." The material of which such sealing means is composed is not described.

Bieling describes a device for suspending a plurality of piezo-electric crystals from a "common mechanical supporting structure in such manner that each crystal, although mechanically interconnected with other crystals, is free to vibrate at its own frequency with minimum losses and a minimum amount of mechanical vibratory coupling between the plurality of vibrating crystals." He makes no reference to a crystal housing. His disclosures are irrelevant to the issue of the validity of the patent in suit.

Espe claims "an electron discharge device comprising a cylindrical metal envelope closed at one end with a header, the header comprising a metal ring telescoping into said end of the shell and joined gas-tight to the rim of the shell, a glass disc sealed gas-tight along its periphery to said ring, lead-in conductors for electrodes sealed in said disc, and a metal shielding plate parallel to said glass disc in the shell and supported along its edge on said ring." The purpose and method of functioning of the Espe device, as described in its specifica-

tions, distinguishes it from that covered by the patent in suit, and the claims of Espe do not read on those of Wintermute. The function of Espe is to shield the electrode assemblies from each other and from external electrical disturbances. That of Wintermute is to exclude atmospheric contamination of the housed piezo electric element.

Bowie discloses a closure for electric discharge tubes of the vacuum or low pressure type. Its principal object is "to provide an electron discharge tube of the composite metal-glass evacuated envelope type, having a vitreous window or closure member which is supported around its periphery against atmospheric pressure by a member which is not sealed into said vitreous member." Bowie claims that his electron discharge tube has "a body portion in the form of a metal tube, a flange at the end of said body portion defining a peripheral seat, a vitreous closure member for said tube * * * supported from said flange by a plurality of spaced projections, a metal frame sealed in a vacuum-tight manner into and around the closure member (and) fastened to the end of the tube in a vacuum-tight manner." The foregoing claim does not read on either of the Wintermute claims here relied upon; but the suggestion that "kovar" metal (a cobalt-nickel-iron alloy), be used for the body to which the "Corning 705AJ" glass neck is sealed vacuum-tight by reason of equivalence of the coefficients of expansion of the respective substances, conclusively proves that such substances and that equivalence were known to the art prior to March 11, 1937.

The Thorson patent of 1940 taught "the fabrication of glass-to-metal seals by which the leading-in conductors are insulatingly taken through the envelopes of metal electric discharge devices." Thorson explains that the leading-in conductors are brought through the header and insulated therefrom by means of a seal made of a fusible vitreous material, such as crushed glass, deposited upon the conductor under application of heat to both the metal and the glass. This

teaching of Thorson was apparently availed of by Beggs, whose 1941 patent No. 2,229,436 claimed a "method of fabricating a sealed electrical device which in finished condition includes two container-forming iron parts assembled in vacuum-tight relation and having lead-in conductors sealed through one of the parts, * * * sealing the lead-in conductors through the said part by applying fusible vitreous material * * *, and joining the said two parts by fusing between them a metallic solder having a melting point on the order of 200° C." Beggs copper-plated his base part, and removed the copper oxide formed during the sealing of the lead-in conductors before soldering the two container parts together.

A later patent, No. 2,344,280, issued to Beggs on March 14, 1944 on application filed April 11, 1942, further extended the art applied by Wintermute in the device claimed in the patent in suit. In No. 2,344,280 Beggs describes his invention as "an improved lead-in arrangement * * * especially applicable in connection with metal-enclosed electrical discharge devices * * * to provide a lead-in construction which is especially characterized by its ability to withstand mechanical and thermal shock. * * * For energizing and supporting the enclosed electrode structures there are provided relatively rigid lead-in conductors which project through * * * openings punched or otherwise formed in the header. These conductors are shaped at their outer extremities to serve as contact pins for insertion in a cooperating socket and are inwardly connected to the electrode structure. Each lead-in conductor is supported in insulatingly spaced relation with respect to the header by means of a mass or bead of fusible vitreous material which also constitutes a seal for the associated header opening." The specifications of this (Beggs) patent afford further directions for its application, as follows: "Assuming that the metallic parts associated with the seal are constituted of iron or of a material having the expansion characteristics of iron, the vitreous material employed for completing the seal may suitably be a glass of the character described in Patent No. 2,272,747 granted February 10, 1942 in the name of A. W. Hill and Louis Navias." Neither party has offered this Hill-Navias patent in evidence.

Although the Court has found that Wintermute's reduction to practice antedated the filing of the application for the Ziegler patent (No. 2,503,429 issued April 11, 1950), we learn from the specifications of the latter that "[t]he hermetically sealed conductors extending through the base are formed by applying a highly vitreous bead of glass, such as borosilicate glass, to the conductor and simultaneously sealing the bead in a metallic eyelet provided with a flange portion. The conductor and eyelet are preferably formed of an iron-nickel-cobalt alloy obtained commercially under the trade name 'Kovar', this alloy having a coefficient of expansion which is compatible with the borosilicate glass bead which forms the hermetic seal of the conductor." Plaintiff's witness, Adams, testified that the sealing of glass to metal was well known in the vacuum tube art long before plaintiff's conception of his claimed invention, as was also that the thermal expansion rates of each of the two substances should be similar. (See discussion of Bowie patent, supra.) There was no novelty in the use in plaintiff's device of Kovar metal and Corning 705 or 704 borosilicate glass. Wintermute testified that Westinghouse had about eight patents on "Kovar" prior to 1943 and that Corning had been making glass for matching use with "Kovar" in the electronic arts.

Counsel for plaintiff argues, however, that "[n]othing in the cited art discloses: (1) the assembling of the crystal and holder after fusion of the glass-to-metal seal; or (2) the mechanical arrangement of the mount, mounting base, cap and insulation material to form the rigid, self-supporting mechanical structure set forth in the claims; or (3) the

use of a common temperature coefficient of expansion for the frame, pins and insulation seal."

■■■ The patent in suit is a combination patent. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162; Long v. Arkansas Foundry Co., 8 Cir., 1957, 247 F.2d 366. The Court is required to scrutinize its claims with a care proportionate to the difficulty and improbability of finding innovation in an assembly of old elements. Stanley Works v. Rockwell Mfg. Co., D.C.Pa.1952, 106 F.Supp. 311, affirmed 3 Cir., 1953, 203 F.2d 846, certiorari denied 346 U.S. 818, 74 S.Ct. 30, 98 L.Ed. 345; Concrete Appliances Co. v. Gomery, 1925, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222; Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. The elements of the Wintermute patent are old. Mere substitution of materials, if no new results are achieved, does not attain the dignity of invention. The subject-matter of the patent (hermetically sealed metal housing for a piezo electric crystal unit) must display invention as a whole, more ingenuity than the work of a mechanic skilled in the art, and a substantial innovation for which society is indebted to the patentee's efforts. See Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Cuno Engineering Corp. v. Automatic Devices Corp., supra; Tipper Tie, Inc. v. Hercules Fasteners, Inc., D.C.N.J.1955, 130 F. Supp. 3, affirmed 3 Cir., 1956, 232 F.2d 635. The Third Circuit, in Fisch v. Gould, 1957, 246 F.2d 5, certiorari denied 1958, 355 U.S. 914, 78 S.Ct. 341, 2 L.Ed.2d 273, and in R. M. Palmer Co. v. Luden's, Inc., supra, has pointed out that the "flash of creative genius" test which was applied to an improvement or combination patent in Cuno Engineering Corp. v. Automatic Devices Corp., supra, "is not accepted as a fair standard for judging patentability" [246 F.2d 7],

and that § 103 of the Statute has modified the criterion for determining whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." [236 F.2d 498.] More recently, the First, Second and Seventh Circuits respectively have passed upon combination patents in which the device disclosed relatively minor improvements over the prior art. In Emerson v. National Cylinder Gas Co., 1 Cir., 1958, 251 F.2d 152, 155, the patents in suit related to improvements in resuscitators to artificially promote human breathing. The Court, in affirming the invalidation of the patents for lack of invention over prior art disclosed in earlier patents applied the § 103 criterion, viz. whether "a person having ordinary skill in the resuscitator art could have produced, if he had so desired, a machine such as that disclosed in the * * * patent without any exercise of inventive faculty, then such device would not meet the required standard of invention." In one of the patents in Emerson, the novelty was the location of the venturi (through which oxygen under pressure was fed) in the exhalation circuit only, whereas in the prior art it was located in the inhalation circuit. This novelty, the Court said, "was a result of the application of mechanical ingenuity alone and not due to the exercise of any inventive faculty." A further novelty in the patent considered in the same (Emerson) case consisted of features affording greater portability and flexibility. The Court found that these improvements "required very little mechanical change other than the physical fact of separating the oxygen tank of the (prior art) resuscitator from the resuscitator mechanism and * * * this change did not constitute invention." In Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 132, certiorari denied 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112, the patent taught the use of striation or random

grooving in plywood paneling to overcome the long-existent problem of edge separation and checking of Douglas fir plywood. This was held to be a novel and inventive advance over the prior art and an improvement requiring more inventiveness than might be expected of the skilled mechanic. The Court held that the striation taught by the patent "has a very real utility which arises primarily from the deep grooving, a utility which was insubstantially present in the prior art and at most, if at all, only dimly perceived." We are reminded in Georgia-Pacific (at page 133 of 258 F.2d), that, "since the passage of the 1952 Act, 35 U.S.C.A. § 1 et seq., * * * restrictive judicial views of inventiveness developed in cases where duly issued patents were declared invalid departed from the more liberal standards pertaining at a prior time and forced Congressional reinvigoration of the standards. Lyon v. Bausch & Lomb Optical Co., 2 Cir., 1955, 224 F.2d 530, certiorari denied 350 U.S. 911, 76 S.Ct. 193, 100 L.Ed. 799. Expertness and experience in passing upon patents lie primarily in the Patent Office and these important factors are only partially offset by the greater concentration and the additional relevant evidence which can be brought to bear in any particular patent litigation in the courts. The presumption of validity is entitled to particular weight when, as here, the file wrapper history discloses a careful consideration by the Patent Office before issue." In the case at bar some of the patents relied upon by the defendant as anticipating the patent in suit were not cited and apparently were not considered by the Patent Office. On the other hand, B. & M. Corp. v. Koolvent Aluminum Awning Corp. of Ind., 7 Cir., 1958, 257 F.2d 264, 267 held invalid, by reason of anticipation and lack of invention, claims of a patent for a clip to hold pans and covers forming the roof of a metal awning in place on supporting cross-members without the necessity of nuts and bolts, and changing the configuration of pan and cover flanges so that they could be held in place by such clip. In appraising validity the Court applied the test of "whether the art of sheet metal roofing [was] so remote that students of the art of sheet metal awnings would not naturally have looked there for help." In the further words of the Court, "[i]nvention does not consist in the mere conception of applying an old device to a new use if the new use is so analogous to the old that the thought of adopting the device and applying it to the new use would occur to one skilled in the art and seeking to devise means to perform the desired function." Id., at page 267.

Neither of the claims upon which the plaintiff here relies makes mention of the sequence in which the respective operations of assembling of crystal and holder and fusion of the glass-to-metal seal are accomplished. That the glass-to-metal sealing in the base is normally accomplished before mounting of the crystal is not claimed as an inventive feature of the combination, although asserted to be such in the argument. The mechanical arrangement of the combination components, which are old, is no more than would suggest itself to the mind of an ordinarily intelligent person experienced in the art to which the supposed invention relates. The use of materials having equivalent coefficients of expansion for the glass-to-metal sealing of the device has already been shown to be old in the art.

Upon the evidence herein reviewed, I find claims 6 and 14 of Wintermute's United States Patent No. 2,454,244 invalid because they fail to disclose invention and are anticipated by Bowie, No. 2,178,826, Thorson, No. 2,220,742, Beggs No. 2,229,436 and Beggs No. 2,344,280. None of these prior art patents was cited in the patent in suit. The statutory presumption of the validity of the patent in suit "cannot usurp the province of the court to declare what constitutes novelty." Crosley Corp. v. Westinghouse Elec. & Mfg. Co., 3 Cir., 1945, 152 F.2d 895. It becomes unnecessary, therefore, to decide the issue of infringement. National Transformer Corp. v. France Mfg. Co., 6 Cir., 1954, 215 F.2d 343.

This opinion shall be deemed to embody the Court's findings of fact and conclusions of law required by Rule 52 of the Rules of Civil Procedure, 28 U.S.C. An order for judgment dismissing the complaint, with costs, may be presented.