**STANDARD KOLLSMAN INDUSTRIES, INC., Plaintiff,**

v.

**SARKES TARZIAN, INC., Defendant.**

**Civ. A. No. 298–60.**

United States District Court
D. New Jersey.

Feb. 26, 1963.

As Amended Feb. 28, 1963.

Norman N. Popper, Newark, N. J., and Ostrolenk, Faber, Gerb & Soffen, by Sidney G. Faber, New York City, for plaintiff.

Lesnik & Amoscato, by Herbert A. Bernstein, Newark N. J., and Mason, Kolehmainen, Rathburn & Wyss, by M. Hudson Rathburn, Reginald K. Bailey, Clemens Hufmann, Chicago, Ill., for defendant.

WORTENDYKE, District Judge.

This patent infringement action is brought under 35 U.S.C. § 281. This Court has jurisdiction by virtue of the provisions of 28 U.S.C. § 1338.

The plaintiff, formerly Standard Coil Products, Inc., is the owner of three United States patents, with infringement of certain claims of each of which it charges the defendant. The patents in suit are respectively U.S. No. 2,496,183, hereinafter referred to as the basic or '183 patent, U.S. No. 2,620,378, hereinafter referred to as the fine tuner or '378 patent, and U.S. No. 2,755,386, hereinafter referred to as the shield or '386 patent. Defendant counterclaims for a declaratory judgment of invalidity, and non-infringement.

The devices disclosed by the patents in suit consist of tuners and parts thereof used in radio and television receivers. By means of such a tuner, a desired broadcast signal may be selected by "tuning in" the receiver to a specific radio frequency band or channel. The tuner is equipped with a number of tuned circuits which permit of the selective passage into the receiver of a certain band of frequencies, while rejecting all frequencies above and below the selected band.

The parties have adopted the following statement in plaintiff's brief, of the principles involved in tuning a radio or television receiving set to a particular band or channel:

"A tuned circuit is basically a filter —like a pair of sieves. Two sieves, one with holes slightly larger than a desired particle size, and one with holes slightly smaller, will pass only particles of a size ranging between the diameters of the two sets of holes. The well-tuned (electrical) circuit will pass only one carrier frequency of a desired band width (wide enough to include all the modulating voice and picture frequencies imposed on the carrier) and will prevent the passage of higher or lower carrier frequencies. A (receiving) set tuned to Channel 4 will pass through only the Channel 4 carrier and reject all other channels. * * *

"A tuned circuit is a circuit which resonates electrically at a selected frequency. It employs an electrical conductor of a selected length or

number of turns (an inductance) and a capacitor (arranged) in series or in parallel."

The frequency at which a tuned circuit resonates is a function of the inductance and the capacitance. In other words, the frequency of the electrial resonance varies as the inductance and the capacitance. To change the resonant frequency (the frequency which will be passed from the antenna to the receiver) one may vary the inductance or the capacitor. Variation of the inductance may be achieved by movement of a sliding contact along its length, by substitution of coils, or by varying the magnetic field by inserting or removing varying amounts of metallic elements. A capacitor may be varied by varying the effective areas of its electrode plates or the character of the insulator between the plates. Each tuned circuit consists of a combination of a capacitance (a condenser) and an inductance (a coil). Variation of the capacitance or the inductance effects a change in the band of frequencies which can be selected by the tuned circuit so as to correspond to the different bands of frequencies assigned to different television channels. Television tuners are and have been of two general types, viz.: The switch type and the turret type. The devices which exemplify the teachings of the patents in suit belong to the turret category of tuners. We are not here concerned with the switch type tuner. In the conventional turret type of television tuner, coils having different inductance values may be selectively connected to the capacitive branch of the tuned circuit and by this means the frequency band selected may be varied to select the frequency of a particular television station. In the conventional turret type television tuner, coils which are wound with a different number of turns, with different values of inductance, are mounted on panels of insulating material in a rotatable drum-type structure. By rotation of the drum to different successively fixed positions, inductance coils are selectively inserted in the appropriate points in the tuner

circuitry. In addition to effectuating this selective connection of inductance coils into the tuned circuit, variation in the capacitance of the circuit is effected by the adjustment of a variable capacitor which is accomplished independently of the rotation of the turret which carries the coil panels. While the teachings of the patents here in suit are incidentally in the field of radio and television transmission and reception, they are primarily mechanical in character.

A turret-type tuner was disclosed in U.S. Patent No. 1,899,144 issued to Gebhard February 28, 1933, on application filed January 25, 1929, consisting of an inductance system with a fixed frame supporting a rotatable frame comprising lateral members carrying a plurality of inductors and rotor contactors in electrical rotation with the inductors. The fixed frame carried fixed contactors adapted to engage the rotor contactors as the rotatable frame is rotated. A later U.S. patent issued to Gebhard February 6, 1934, on application filed December 6, 1932, for a frequency changing apparatus, claimed:

"1. * * * a supporting structure, a metallic housing carried by said supporting structure, a plurality of electrically shielded metallic compartments formed in said housing, insulated supports in each of said compartments, inductance units of different frequency characteristics carried by said supports and having taps thereon, said inductance units being spaced from the walls of said metallic compartments, a rotatable metallic cylinder disposed concentrically within said metallic housing, contact members extending through apertures formed in said rotatable cylinder for establishing connection with selected taps on said inductance units, and means for angularly shifting said cylinder for correspondingly establishing connection with a selected inductance unit."

A turret type television tuner was developed by the Philco Corporation in or-

prior to 1947. That tuner generally resembled earlier radio turret tuners; but instead of providing a separate turret position for each of the twelve assigned television channels, the Philco turret tuner could accommodate only eight television stations which could be received at any one locality. When a television receiver with a Philco tuner was moved to a different locality at which different stations were receivable, the individual coil-supported panels of the tuner could be removed and replaced by other coil panel units tuned to stations broadcasting to the new locality. The removal and substitution of panels for this purpose was facilitated by a "snap-in" construction of the panels, by means of resilient means for releasably securing the individual panels in place on the drums. This Philco tuner was disclosed in U.S. Patent No. 2,545,681 issued to Zepp on March 20, 1951, upon application filed March 22, 1947.

In May, 1947, more than a year prior to the application (July 23, 1948) for the Thias '183 patent, Sarkes Tarzian commenced the manufacture of turret type television tuners of panel construction, using individual coils for the different television channels, separately wound and connected by hand upon each panel before assembly into the turret. These tuners were designated as TT–1 type tuners, and over 14,500 of them were sold during 1947 and 1948.[1] In the Tarzian TT–1 tuner, the coils for each television channel were mounted on the inner face of each individual panel. Contact members on the outer face of each panel were adapted selectively to connect the coils to the stationary contacts upon selective positioning of the turret. The individual panels, with their associated coils and contacts, were held in place on studs extending radially from the periphery of each end disc by means of threaded nuts; thus permitting removal and re-placement of each panel. A detent mechanism for indexing the rotary turret to the respective positions corresponding to the individual panels was made unitary with one of the end discs of the turret.

The '183 patent owned by the plaintiff discloses a turret-type television tuner employing two panels for each television channel. One end of each panel is interlocked with a central detent disc to prevent radial and circumferential displacement thereof, and the other end of each panel is releasably retained in a position parallel to the axis of the drum by means of a single spring disc riveted to the adjacent end disc of the turret and provided with individual spring arms projecting radially from its center along its perimeter. In Column 1, lines 19–25 of the '183 patent, the patentee says: "Such individual panels as employed in prior switching units have been secured in place by means of spring fastening devices, and the construction has been such as to require at least one and sometimes two individual spring elements on each such panel or on the drum for cooperation with each such panel." And, in Column 3, lines 61–66: "Under the present invention, the spring latch means for all of the 12 panels at one end of the drum are provided by a single member that may be readily formed by the economical process of stamping and forming."

It is the defendant's contention in this case that the plaintiff's '183 patent is anticipated by Zepp No. 2,545,681, by Philco's commercial tuner, and by defendant's TT–1 commercial tuner in connection with the Zepp patent.

Claim 4 of the Zepp patent (U.S. No. 2,545,681 issued March 20, 1951, on application filed March 22, 1947) describes the device disclosed thereby in the following language:

"4. In a switching assembly, a rotatable barrel-like member having

---

1. Defendant produced invoices disclosing shipments of numbers of its TT–1 television tuners, exemplified by P–30 and D–12, in May, June and August, 1947. Drawings dated respectively September 20, 1946 and December 2, 1946, made by Stromberg Carlson Company, to whom defendant sold some of the tuners, were used by defendant in constructing the tuners.

a plurality of outwardly-facing apertures arranged about the periphery thereof, a plurality of non-conductive supporting bases, each carrying reactive circuit means, each said base further including a portion projecting therefrom, and resilient clip means; said projecting portion being adapted to engage the wall structure defining an associated one of said apertures in response to introduction of the base into said aperture, and said clip means reacting between said barrel-like member and said base when said base has been so inserted; the construction and arrangement being such that said base is resiliently and removably retained within the aperture through the agency of said clip means and said portion."

The specifications of the Zepp patent describe the "resilient clip means" of inserting, holding and removing the supporting bases of the various coils illustrated in the patent drawings in the following language (the omissions indicating references to the specific drawings):

"[T]he illustrated embodiment of the invention comprises a pair of rotatable barrels, or 'turret' members, * * * each of which is fixed upon a shaft * * * in any convenient manner, * * * These turret members are adapted for rotational movement about the axis of [the] shaft * * *, in response to manipulation of a control knob * * * [T]he turret * * * carries a group of removable coil forms * *, and each of these forms supports inductances tuned to a particular station and includes both the inductance necessary to tune the R.F. amplifier plate circuit and the inductance required to tune the oscillator tank circuit. Similarly, the [other] turret member * * * carries a plurality of coil forms * * * which forms are also readily removable, * * * and each of which includes inductance coils adapted to be employed in the antenna circuit of the television receiver * * * The coil forms or supports carried by each turret are provided with contact buttons * * * and * * * these coil forms and their associated inductances may be brought progressively into a predetermined angular position in which the buttons * * * bear against similar fixed contacts * * * each of which has a terminal * * * adapted for connection to the conductor leading to the circuits of the receiver. * * * [R]otation of the control knob * * acts to move the inductance supports in such manner as to bring said supports into registry with the stationary contacts * * * (mounted on the frame or housing of the control device) * * * progressively and in pairs."

The Zepp specifications further point out that as each succeeding pair of inductance support elements or coil forms is brought into registry with the fixed contacts "another broadcast station will be selected, as predetermined by the nature of the circuit elements * * * carried by the next pair of supports * * *" The Zepp tuning mechanism is mounted within a housing comprising side and end walls. Each of the two turret members is described as octagonal; "the number of faces or sides being determined by the maximum number of stations to be preselected, and each of the faces is provided with an elongated rectangular aperture * * * within which may be received the coil supports * * *" These coil supports are mounted in the elongated rectangular apertures by inserting a retaining element or tongue projecting from one end of each support member beneath the edge defining one end of the aperture and by pressing in the other end of the support toward the axis of the turret until the spring clip at that end engages with the opposite end of the rectangular aperture. Means of bringing a different pair of coil supports into the position in which contact is made with the fixed contacts carried by the wall of the housing (indexing of the

shaft) is provided by a cam member having eight detent peripheral indentations. The cam member is fixed to the shaft and cooperates with a lever which carries a roller which is urged into contact with the cam member by means of a spring. As the shaft is rotated the spring forces the roller into the successive indented areas, thus causing the turret slots to be indexed in such positions that the desired coil contacts are in registry with the fixed contacts. The cam member carries a radially projecting stop cooperable with the roller to provide fixed limits for the angular movement of the shaft and thus make possible selection of successive receiving circuits in a predetermined progressive sequence.

The combination of the "detent" and the "resilient clip" of the Zepp patent are disclosed in Claim 5 thereof, which reads as follows:

"5. In a switching assembly, a rotatable member including a pair of spaced support portions arranged in substantial parallelism, and a plurality of non-conductive supporting bases each carrying reactive circuit means and including contacts, said bases and support portions including interengageable detent means and clip means, said detent means and clip means releasably retaining each base between the said spaced support portions."

Although the Zepp patent was not listed among the references cited to the '183 patent in suit, the similarity of the essential features of the devices described in the claims of the respective patents is striking, and was impressively illustrated in charts in evidence upon the trial of this case.

Plaintiff charges infringement of claims 2, 5, 8 and 10 of the '183 patent in suit. The device disclosed in these claims is essentially a switch, manually operable by rotation of circular discs fixed in planes perpendicular to a horizontal shaft between which coil-carrying panels of varying inductance, extending parallel with the shaft and arranged peripherally around the discs may be successively brought into electrical contact with the terminals of the antenna leads fixed to the frame of the housing with which the switch is surrounded. The arrangement of the coilpanels around the perimeters of the discs longitudinally of and parallel with the shaft to which the discs are fixed perpendicularly forms a turret-type barrel or drum-like cylinder by the rotation of which each coil of varying inductance may be manually brought into electrical resonance with a different television channel frequency coming in over the receiver's antenna. One of the circular discs fixed to the shaft is provided with uniform serrations or indentations throughout its circumferential perimeter for the successive reception of a spring-impelled idler roller, which limits rotation of the shaft and discs to one notch at a time. The reception of the idler roller into each notch in the perimeter of the detent disc prevents the circumferential movement of the coil panel contacts away from the fixed antenna contacts on the frame or housing. The coil panels are held in position against longitudinal and circumferential movement by means of a lug and a finger spring at opposite ends of each panel which cooperate with the ends and sides of the slots in which they are inserted; but permit ready manual removal and replacement. The only novel features claimed by the plaintiff for its '183 patent are (1) the provision of a single spring disc, riveted to each end disc of the turret, provided with individual spring arms projecting radially from the center of the disc and serving to releasably latch all coil panels in position, and (2) the employment of the middle of the three panel-carrying discs as a detent mechanism by providing its perimeter with indentations for the successive reception of an idler roller resiliently fixed to a wall of the turret housing.

Plaintiff sold its first turret-type tuner in September of 1948. It was similar in many respects to the Sarkes Tarzian TT–1 type tuner. For several years prior to the arrival of the TT–1 type tel-

evision tuner upon the market turret-type tuning units had been in general public use for radio receivers. These radio tuners consisted of a plurality of inductance coils arranged in an annular series between spaced end discs mounted on a central shaft to provide a rotatable drumlike structure or turret. Plaintiff's Thias '183 patent states that its embodiment is a "circuit component selecting means for radio, television and like apparatus."

The disclosure of Zepp clearly and completely anticipates claim 8 of the Thias '183 patent, as will appear from the following comparison of that claim with the Zepp embodiment. Each is a turret tuning apparatus whereby circuit components may be selected. The apparatus is in the form of a horizontally mounted drum or series of drums rotatably mounted upon a shaft within a box-like housing frame composed of rectangular side and end walls. The housing frame bears a plurality of stationary contacts connected or adapted to be connected to portions of the electrical circuit of the tuner. The end walls of the selector turret drum or drums consist of plane or convex discs arranged in spaced parallel relation connected with and perpendicular to the axis of rotation of the drum or drums. A plurality of coil supports in the form of rectangular dielectric panels are disposed parallel to the axis of rotation of the drum or drums in spanning relation between the end and interior discs of the drum or drums. Each of the panels has reactance coils secured thereto, and contacting members which are adapted to selectively connect the supported coil to the stationary contacts on the housing frame upon selective positioning of the drum or drums. In Thias '183, at one end of each coil-carrying panel is a lug or lugs which fits into a slot in the contiguous disc, preventing radial or peripheral movement of the panel. Peripheral movement of the other end of the panel is prevented by interlocking arrangement with its contiguous disc. Riveted to the distal surface of and in parallel plane with the latter disc is a flexible circular plate with radially extending inverted L-shaped projections about its perimeter which releasably secure the contiguous end of the coil panel against radial movement, but permit easy removal of the panel by manual flexing of the retaining disc projection. Zepp provided his coil-carrying panels with radially extending spring fingers at one end of the panel which associate with the proximal end wall of the turret by engagement with the end of the slot in the periphery of the drum in which the panel is inserted. These spring fingers releasably secure the end of the panel against radial movement, but permit easy removal of the panel by manual flexing of the spring finger.

Claim 10 of the Thias '183 patent, besides defining the panel retaining resilient spring finger disc, discloses a detent mechanism comprising "circumferentially spaced indentations" on one of the turret-forming, panel-retaining discs, and "resilient means secured to * * * (the) frame (housing) adapted to engage successively each of said (circumferentially spaced) indentations to selectively" position the drum. The same function is performed in the Zepp embodiment by a detent mechanism consisting of a disc with circumferentially spaced indentations in cooperation with a resilient roller adapted to engage successive indentations as the turret is rotated. The detent discs in both Thias and Zepp are fixed to and turn with the shaft, and cooperate with a resilient roller adapted to engage successive indentations in their perimeters. The Thias detent disc is integral with and is one of the coil-carrying panel-support members of the turret drum. The Zepp detent disc is beyond the end of, but rotates with the panel-carrying drums.

■ Claims 8 and 10 of Thias '183 are invalid over Zepp. 35 U.S.C. §§ 102, 103.

■ The panel-end retaining means defined in claims 2 and 5 of Thias '183 do not constitute invention, and are therefore invalid because they disclose mere

transposition of parts, convenient assembly, or facilitation of removability. This does not amount to invention. Cofield v. Sunny Line Appliance, Inc., 6 Cir., 1924, 297 F. 609. Thias was chargeable with knowledge of all of the preexisting devices employed in turret-type television tuning devices. He was especially familiar with the use of the combination of a detent disc and resilient roller for purposes of indexing coil carrying panel contact points with fixed stator points. The utility and effectiveness of resiliently removable rotatable coil panels was also well known to him; and the efficacy of a spring clip in conjunction with a fixed lug to prevent longitudinal and circumferential movement of a panel was also well-known in the prior art. The provision of longitudinal and centripetal pressure by means of the radial fingers of a single resilient end disc was an obvious mechanical equivalent of the combination of lug and spring disc known in the prior art. The accomplishment of Thias does not rise to the dignity of invention. Mast Foos & Co. v. Stover Manufacturing Co., 1900, 177 U.S. 485, 20 S. Ct. 708, 44 L.Ed. 856. He has accomplished only combinations of elements old in the art, producing no new results in the contemplation of the patent laws. The rearrangement of the detent disc and of the panel retaining end disc substitution would have been obvious to a person having ordinary skill in the prior television turret-type tuner art. An integral disc with individual spring arms projecting generally radially was well-known.

I conclude that claims 2, 5, 8 and 10 of plaintiff's basic Thias patent, U.S. No. 2,496,183, are invalid over prior art, and do not amount to invention. The issue of infringement of these claims, therefore, becomes moot.

The device claimed in plaintiff's '378 fine tuner patent is a variable capacitor operable by means of a sleeve shaft which is coaxial with, but operable independently of the shaft to which the coil selector shaft is fixed. Fixed generally normal to the axis of the sleeve shaft, and rotatable therewith is a spiral dielectric plate extending between two conductive condenser plates fixed at one end of the tuner frame. The plane of the dielectric plate is biased so as to remain in frictional contact with one of the conductive plates and prevent movement during rotation of the channel selector turret. As explained ante, resonant frequency may be altered by varying either the inductance or the capacitance. Inductance is varied by substitution of coils of differing numbers of turns. Capacitance is varied by modifying the effective areas of the electrode plates of the condenser or the character of the dielectric insulator between them. The electrode plates of a condenser are generally two or more metallic conductive plates in spaced parallel relation to each other separated by air or other dielectric substance. By changing the area of the interposed dielectric in relation to the area of the opposing faces of the conductive plates, the capacitance of the condenser is varied. The spiral shape of the dielectric member in relation to the rectangularity of the faces of the conductive plates between which it is rotatable permits a progressive or regressive variance of the degree of intrusion by the dielectric of the electric field between the condenser plates, thereby changing the capacity of the condenser. Claim 3 of the '378 patent, upon which plaintiff relies, teaches as follows:

"3. In a turret type tuning unit, a box-like frame, a shaft extending from one end of said frame for operating said turret, and a variable capacitor comprising a conductive surface insulatedly mounted on the inside surface of said end of said frame substantially adjacent said shaft and extending through an aperture, therein, a conductive plate secured to said end of said frame having a portion extending in spaced parallel relation to said conductive surface to thereby define two plates of a capacitor, a hollow shaft rotatably journaled on said first shaft having a dielectric tuning plate secured thereto perpendicular to the axis

thereof and extending outwardly for rotary movement between said capacitor plates, said dielectric plate having a spiral configuration whereby upon rotation around said first shaft to vary the capacity of said capacitor, and resilient means for urging said dielectric plate into frictional engagement with said parallel plate portion,[2] said parallel plate portion being formed with integral stop means for engaging an extending finger formed on said dielectric plate to prevent complete rotation thereof."

The foregoing claim language is reducible, as far as it claims inventiveness, to the description of a dielectric tuning plate of spiral configuration secured perpendicular to the axis of and near the end of a hollow shaft rotatable coaxially about the turret shaft of a Thias '183 tuner, the rotation of which dielectric, between a conductive surface extending through one end of the turret housing and a conductive plate secured to the same end of the housing in spaced parallel relation to the former surface varies the capacity of the condenser formed by the surface and the "plate." A leafspring carrying the outer condenser plate urges it into frictional contact with the dielectric (according to the patent drawings). A projection on the perimeter of the dielectric comes into stopping contact with interiorly extending projections on one of the condenser plates when the dielectric is rotated through less than 360°.

There is no novelty in journaling a hollow shaft upon a solid shaft; nor in fixing a disc perpendicularly upon, and for rotation with such a shaft. If the disc is dielectric, and the plane of its rotation is between and parallel to the conductive plates of a condenser, the degree of intrusion of the dielectric into the interplate space will vary in proportion to the degree of non-circularity of the disc, and the capacity of the condenser will be varied. The use of projections from the proximal surfaces of two planes in parallel relation to each other to limit relative movement of each in the same plane is ancient and multifarious. Neither the location of condenser plates exteriorly to a tuner housing, nor the penetration of the housing end wall by an electrical conductor to one of the plates fixed upon the exterior of the wall amounts to invention. Plaintiff's expert conceded that the location of the variable dielectric and condenser *outside* the tuner housing did not constitute invention.

There remains for consideration so much of the claim relied upon as discloses the spiral configuration feature of the rotatable dielectric. Plaintiff's TV–101 tuner was sold commercially as early as September, 1948. The Thias '378 fine tuner patent here in suit was issued December 2, 1952 upon application filed November 29, 1949. Plaintiff's TV–101 tuner disclosed a fine tuning arrangement consisting of a rotatable dielectric plate of spiral configuration secured to the outer hollow shaft of the 101 tuner perpendicular to the axis of the shaft. The dielectric was rotatable between the plates of a condenser. One conductive plate is secured to the end of the tuner frame and a portion of that plate extends in spaced parallel relation to the other plate, which is insulatedly mounted on the stator support. Moreover a rotation-limiting stop means is provided in the 101 tuner, consisting of a projection on the dielectric plate, adapted to engage a screw extending from the housing wall.

In the specifications of U.S. Patent No. 2,488,791, issued to Zaat, on application filed July 19, 1947, disclosing an electron-discharge tube with trimming condenser, it is explained that two electrodes of a

2. In claim 2 of the '378 patent, not relied upon in this case, Thias refers to a "dimple" in one of the condenser plates as cooperating with a "resilient means" for urging the dielectric plate into frictional engagement with the "dimple."

Claim 3, solely relied upon, makes no mention of a "dimple." The patent office held: "With the exception of the dimple, integral stop means and extending finger the variable condenser structure is fully met by Zaat."

472

condenser are separated by a dielectric in the form of an insulating plate which is rotatable about a pin and exhibits an aperture of such shape that upon rotation of the plate the quantity of insulating material between the electrodes of the condenser changes, with the result that the capacity of the condenser is changed. The shielding plate which partially forms one electrode of the condenser is " * * * provided with one or more incisions in a manner such that that portion of this plate, which functions as an electrode for the trimming condensor, engages the dielectric resiliently."

■ Claim 3 of the '378 patent here in suit is invalid over the prior art taught by Zaat and disclosed in plaintiff's TV-101 tuner. 35 U.S.C. §§ 102 and 103.

■ The problem of undesirable feedback in electronic amplifier circuits resulting from currents induced in the amplifier mounting chassis or from stray capacitive or inductive coupling within elements evoked the shielding arrangement disclosed in U.S. Patent No. 2,512,-138 issued to Butt June 20, 1950 on application filed June 1, 1945. In the Specifications of the Thias tuner shield patent here in suit (issued July 17, 1956, on application filed April 9, 1952), it is explained that the embodiment of his turret type tuner patent '183 was subject to minor reception interference caused by the presence of some oscillator radiation of the radio frequency amplifier tube grid. To remove this interference Thias determined to shield the oscillator from the grid circuit of the radio frequency amplifier tube. Because of the necessity of having his '183 patent turret freely rotatable, the circular center divider disc served as an incomplete shield because it could not fill the cross-section area interior of the rectangular chassis in which the turret rotated. Accordingly, Thias claims novelty in his solution of the shielding problem "by using the existing central transverse circular panel support and indexing plate in the turret as a portion of the shield, and completing

the shielding arrangement with a central metallic chassis subdivider, shaped to fit into the chassis around the turret and (thereby) close up the passages through the interior of chassis left by the circular panel support and indexing plate of the turret, the metallic subdivider being arranged parallel to the circular panel support and indexing plate and in close juxtaposition thereto. * * * The edges of the circular panel support and the subdivider are arranged to overlap." Plaintiff relies upon claim 1 of the '386 "shield" patent. The teaching of that claim is not invention. The chassis of the embodiment of the '183 patent is provided with a metallic strut, intermediate of and parallel with the end walls of the chassis, with its outer edge in the same vertical plane as that of the vertical edges of the chassis, and extending inwardly of the chassis, with a curvature approximately conforming to that of the turret, and in close juxtaposition to the center detent disc thereof. What Thias has done with the supporting strut disclosed in the '183 patent chassis amounts merely to its extension into the interior of the chassis to and up the opposite wall of the chassis in partially surrounding relationship to the turret perimeter and in a plane parallel with and juxtaposed to that of the center detent disc. This is an expedient which would be obvious to a person having ordinary skill in the art. It does not amount to invention. 35 U.S.C. § 103.

Having concluded that all of the patent claims here in suit are invalid, I do not reach the issues of infringement raised by the pleadings. See Wintermute v. Hermetic Seal Corp., D.C.N.J.1959, 171 F.Supp. 770, affd. 3 Cir., 1960, 279 F.2d 60.

The counterclaim is dismissed for mootness.

This opinion shall constitute my findings of fact and conclusions of law in this case. The defendant is entitled to a judgment dismissing the complaint with prejudice and with costs. Let an order be submitted.